FILED IN OPEN COURT
JACKSONVILLE, FLORIDA
9/25/25
U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 3:24-cr-120(S1)-TJC-PDB

JARED DEAN EAKES

# PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Gregory W. Kehoe, United States Attorney for the Middle District of Florida, and the defendant, JARED DEAN EAKES, and the attorneys for the defendant, Darcy D. Galnor, Esq., and Gary S. Shumard, Esq., mutually agree as follows:

## A. Particularized Terms

### 1. Counts Pleading To

The defendant shall enter a plea of guilty to Counts One and Five of the Superseding Indictment. Count One charges the defendant with wire fraud, in violation of 18 U.S.C. §§ 1341, 1349, and 2. Count Five charges the defendant with bank fraud, in violation of 18 U.S.C. §§ 1344, 1349, and 2.

### 2. Maximum Penalties

Count One carries a maximum sentence of 20 years' imprisonment, a fine of not more than $250,000 or twice the gross gain caused by the offense or twice the gross loss caused by the offense, whichever is greater, or both imprisonment and a fine, a term of supervised release of not more than three years, and a mandatory

special assessment of $100. A violation of supervised release carries an additional term of not more than two years' imprisonment, and an additional term of supervised release may be imposed.

Count Five carries a maximum sentence of 30 years' imprisonment, a fine of $1,000,000 or twice the gross gain caused by the offense or twice the gross loss caused by the offense, whichever is greater, or both imprisonment and a fine, a term of supervised release of not more than five years, and a special assessment of $100. A violation of the terms and conditions of supervised release carries a maximum term of not more than three years' imprisonment, as well as the possibility of an additional term of supervised release.

Cumulatively, Counts One and Five carry a maximum sentence of 50 years' imprisonment, a fine of $1.25 million or twice the gross gain caused by the offenses or twice the gross loss caused by the offenses, whichever is greater, or both imprisonment and a fine, a term of supervised release of not more than five years, and a special assessment of $200. A violation of the terms and conditions of supervised release carries a maximum term of not more than five years' imprisonment, as well as the possibility of an additional term of supervised release.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

3.    **Elements of the Offense**

      The defendant acknowledges understanding the nature and elements of the offenses with which the defendant has been charged and to which the defendant is pleading guilty.

      The elements of Count One are:

First:      the defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises;

Second:      the false pretenses, representations, or promises were about a material fact;

Third:      the defendant acted with the intent to defraud; and

Fourth:      the defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

      The elements of Count Five are:

First:      the defendant knowingly carried out or attempted to carry out a scheme to defraud a financial institution, or to obtain money, assets, or other property from a financial institution, by using false or fraudulent pretenses, representations, or promises about a material fact;

Second:      the false or fraudulent pretenses, representations, or promises were material;

Third:      the defendant intended to defraud the financial institution; and

Fourth:      the financial institution was federally insured or chartered.

4. **Counts Dismissed**

At the time of sentencing, the remaining counts against the defendant, Counts Two, Three, Four, Six, Seven, and Eight will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

5. **No Further Charges**

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6. **Mandatory Restitution to Victims**

Pursuant to 18 U.S.C. § 3663A(a) and (b), the defendant agrees to make full restitution to the victims of his offense conduct, *i.e.*, all conduct described in the Factual Basis attached hereto, as well as any parties who directly compensated victims for financial loss caused by the offense conduct.

7. **Acceptance of Responsibility - Three Levels**

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant understands that this recommendation or request is not binding on the

Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this plea agreement, including, but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

8. **Cooperation – Substantial Assistance to Be Considered**

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed

prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9. **Use of Information – Section 1B1.8**

Pursuant to USSG § 1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG § 1B1.8(b).

10. **Cooperation – Responsibilities of the Parties**

a. The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b. It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1) The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2) The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware

of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3) The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4) The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5) The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case

but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

11. **Forfeiture of Assets**

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(A), and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees. The assets to be forfeited specifically include, but are not limited to, the $2,737,462.20 in proceeds the defendant admits he obtained as a result of the wire fraud scheme charged in Count One to which the defendant is pleading guilty, and the $4,603,280.00 in proceeds the defendant admits he obtained as a result of the bank fraud scheme charged in Count Five to which the defendant is pleading guilty.

The defendant acknowledges and agrees that: (1) the defendant obtained these amounts as a result of the commission of the offense(s), and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the

offense(s) of conviction. The defendant further consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offense(s) and consents to the entry of the forfeiture order into the Treasury Offset Program. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant additionally agrees that since the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the

defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before the defendant's sentencing. In addition to providing full and complete information about substitute assets, these steps include, but are not limited to, the surrender of title, the signing of

a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

**B. Standard Terms and Conditions**

**1. Restitution, Special Assessment and Fine**

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18

U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. The special assessment is due on the date of sentencing. The defendant understands that this agreement imposes no limitation as to fine.

**2. <u>Supervised Release</u>**

The defendant understands that the offense to which the defendant is pleading provides for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3. **Immigration Consequences of Pleading Guilty**

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4. **Sentencing Information**

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5. **Financial Disclosures**

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party.

The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this plea agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

**6. Sentencing Recommendations**

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or

defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

**7. Defendant's Waiver of Right to Appeal the Sentence**

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

**8. Middle District of Florida Agreement**

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

**9. Filing of Agreement**

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

**10. Voluntariness**

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that

defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

**11. Factual Basis**

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

**12. Entire Agreement**

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no

other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

**13. Certification**

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 12 day of September, 2025.

GREGORY W. KEHOE
Acting United States Attorney

JARED DEAN EAKES
Defendant

DAVID B. MESROBIAN
Assistant United States Attorney

DARCY D. GALNOR, ESQ.
Attorney for Defendant

MICHAEL J. COOLICAN
Assistant United States Attorney
Deputy Chief, Jacksonville Division

GARY S. SHUMARD, ESQ.
Attorney for Defendant

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 3:24-cr-120(S1)-TJC-PDB

JARED DEAN EAKES

**PERSONALIZATION OF ELEMENTS**

Count One

1. Did you knowingly devise or participate in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises as alleged in the Superseding Indictment?

2. Were the false pretenses, representations, or promises about a material fact?

3. Did you act with the intent to defraud or mislead?

4. On or about September 9, 2019, in the Middle District of Florida, did you use transmit or cause to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud, that is, a bank wire transaction from the Small World SunTrust Bank account ending in -8563 to the GraySail Capital Management LLC SunTrust Bank account ending in -8281 in the amount of $602,500?

Count Five

1. On or about May 5, 2020, in the Middle District of Florida, did you knowingly carry out or attempt to carry out a scheme to defraud a financial institution, or to obtain money, assets, or other property from a financial institution, by using false pretenses, representations, or promises about a material fact, that is, by submitting a false Paycheck Protection Program loan application to Lender-1 on behalf of your company, Your Advisor Group LLC, in the amount of $960,625.00?

2. Were the false or fraudulent pretenses, representations, or promises material?

3. Did you intend to defraud the financial institution?

4. Was the financial institution federally insured or chartered?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v. CASE NO. 3:24-cr-120(S1)-TJC-PDB

JARED DEAN EAKES

**FACTUAL BASIS**

**Investor Wire Fraud Scheme**

Background

At all times relevant to the Superseding Indictment, the defendant, JARED DEAN EAKES, was a resident of Jacksonville, Florida. EAKES had previously worked as a registered investment advisor and broker in the Jacksonville area.

Between 2017 and 2019, EAKES registered multiple entities in Wyoming which purported to be engaged in investment management services, including GraySail Capital LLP ("GSC"), GraySail Capital Management LLC ("GSCM"), GraySail Advisors, LLC ("GSA"), Your Advisor Group, LLC ("YAG"), and Central Marketing Services LLC ("CMS"), originally named "Assetcentral IRA and Custodial Services LLC," among others. EAKES controlled GSC, GSCM, GSA, YAG, and CMS, and directed their finances and purported investment management-related activities, including a business checking account in the name of GSCM at SunTrust Bank (now known as Truist Bank, hereinafter "SunTrust") with an account number ending in -8281, a business checking account

in the name of YAG at Bank of America with an account number ending in -9243, and a business checking account in the name of Assetcentral IRA and Custodial Services LLC at Bank of America with an account number ending in -9227. EAKES also controlled personal checking accounts at JP Morgan Chase Bank (account number ending in -6052) and Ally Bank (account number ending in -7342), as well as a personal brokerage account at Tastyworks (account number ending in -6919), an online brokerage firm that specialized in options and futures trading.

Small World Capital, LLC ("Small World") was registered in Florida on or about May 23, 2018, by EAKES' associate D.S. Small World never performed any substantive business activities, but D.S. established a corporate checking account in the name of Small World at SunTrust with an account number ending in -8563.

At all times during the alleged scheme, SunTrust was a federally insured bank based in Florida which processed bank wire transfer requests via servers located in Atlanta, Georgia.

Scheme to Defraud

From an unknown date but not later than in or around January 2019, and continuing through in or around February 2020, in the Middle District of Florida, and elsewhere, EAKES knowingly and with intent to defraud devised and executed a scheme to defraud individual investors of their retirement savings and other investment funds. Falsely portraying himself as an investment advisor operating GSCM and related entities with millions of dollars already under management, EAKES identified and contacted financial services providers looking

to sell their books of business via an online marketplace. EAKES agreed to acquire client portfolios (*i.e.*, the client relationships and the assets under management) from two legitimate investment advisors based in Alabama and Arkansas. EAKES, through GSA, subsequently assumed management and control of some of those advisors' client assets. Most of the investor clients (hereinafter, the "Victim(s)") were over age 65 and/or retired.

EAKES then stole Victim funds through several different techniques. Primarily, EAKES caused disbursements from Victim accounts held at a trust company, Equity Trust Company ("ETC"), by transmitting via email to ETC falsified documents which purported that the funds being disbursed would be invested into Small World in exchange for purported "promissory notes," and that the investor Victim had authorized this investment. In reality, Small World was a shell company which had no need to borrow funds, the Victims were never informed about the fraudulent investment in Small World, and the Victims' funds were immediately transferred to accounts EAKES controlled and used for his benefit. During interviews with law enforcement, D.S. advised that Small World was an entity he had registered with the hopes of starting a data analytics business, but ultimately it never performed any substantive business activities. D.S. further advised that he was friends with EAKES, having met him when EAKES was working as an investment broker for a large company. D.S. stated that EAKES had told him that he wanted to open his own investment business, and then when EAKES created the GraySail companies, he asked D.S. to assist him with the

purchase of another investment advisor's business by using Small World as a "middleman." D.S. stated that he opened a business bank account in the name of Small World at EAKES's request, and then received and transferred funds via the account at EAKES's direction. D.S. stated that Small World never issued any promissory notes, he did not recognize the promissory notes sent to ETC, and the signatures on the documents were not his.

As additional fraudulent means of obtaining Victim funds, EAKES also sent email requests to ETC purportedly on behalf of Victims requesting disbursement of funds, which EAKES then converted or attempted to convert to his benefit. EAKES also deposited Victim funds directly into the GSCM SunTrust account, without ever creating a trust account at ETC or another custodian for the Victim.

The Victim funds stolen by EAKES were converted to his personal use in several ways, including: funding his personal Tastyworks investment account where he engaged in options trading which was not authorized by the Victims; using Victim funds to pay the previous investment advisors in accordance with the purchase contracts; using one Victim's funds to pay other Victim(s) who had requested some or all of their investments to be redeemed; withdrawing over $337,000 in Victim funds in cash; transferring Victim funds to his personal accounts to pay bills and other expenses; and transferring more than $115,000 in Victim funds to a Las Vegas-based casino company.

In furtherance of the scheme to defraud, while in the Middle District of Florida, EAKES transmitted or caused to be transmitted several interstate wire transfers containing Victim funds which were processed by SunTrust.

| DATE | INTERSTATE WIRE |
|---|---|
| September 9, 2019 | A bank wire transaction from the Small World SunTrust Bank account ending in -8563 to the GSCM SunTrust Bank account ending in -8281 in the amount of $602,500.00. |
| September 18, 2019 | A bank wire transaction from the GSCM SunTrust Bank account ending in -8281 to EAKES's personal Ally Bank account ending in -7342 in the amount of $391,000. |
| October 16, 2019 | A bank wire transaction from the GSCM SunTrust Bank account ending in -8281 to EAKES's personal JP Morgan Chase Bank account ending in -6052 in the amount of $276,000. |
| November 6, 2019 | A bank wire transaction from the GSCM SunTrust Bank account ending in -8281 to EAKES's personal Ally Bank account ending in -7342 in the amount of $116,000. |

According to the investigation, including interviews and financial analysis of bank accounts and transaction records, EAKES asserted control over and/or converted the following Victims' funds as part of the scheme to defraud:

| VICTIM(S) | FRAUD LOSS AMOUNT |
|---|---|
| T.A. | $11,043.92 |
| J.B. | $244,026.59 |
| T.C. | $249,276.08 |
| P.F. | $53,161.20 |
| D.F. | $345,647.08 |
| R.F. | $741,889.50 |

| | |
|---|---|
| P.L. | $20,399.94 |
| T.L. | $18,114.85 |
| C.M. | $55,000.00 |
| D.M. & J.M. | $115,182.42 |
| G.M. | $233,754.88 |
| S.M. | $265,955.04 |
| S.S. | $281,941.23 |
| D.T. | $64,855.87 |
| K.W. | $12,816.60 |
| J.W. | $24,397.00 |
| **Total** | **$2,737,462.20** |

Some Victims were repaid in whole or in part with other Victims' money by EAKES either as fictitious "interest" payments or redemptions in order to sustain the fraud scheme, or made after the fraud was detected by a Victim and/or the United States. Other Victims later received repayment or other compensation from third parties after the discovery of EAKES's scheme to defraud.

**Loan Fraud Scheme**

The Paycheck Protection Program

The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to

entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders. These loans had government-backed guarantees.

The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.

PPP loan applications were processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the SBA. Data from the applications, including information from the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

PPP loan proceeds were required to be used for certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities. Under the applicable PPP rules and guidance, the interest and principal on the PPP loan was eligible for forgiveness if the business spent the loan proceeds on these expense items within a designated period of time and used a certain portion of the loan towards payroll expenses.

Background

In addition to the Wyoming-registered entities described above, EAKES registered several other entities in Wyoming for the purposes of engaging in fraud, including:

- PaySystems Staffing LLC ("PaySystems"), registered in Wyoming on or about May 12, 2020. PaySystems never performed any substantive business activities, but EAKES established a business bank account for PaySystems at Regions Bank, with an account number ending in -8563, on or about May 18, 2020. EAKES was the sole signatory on the PaySystems Regions Bank account. EAKES also established trading accounts in the name of

PaySystems at Tastyworks: an account with an account number ending in -5440, in or around June 2020; and an account with an account number ending in -2328, in or around August 2020. EAKES's associate R.R. was listed as signatory on both accounts.

- B Holdings Management LLC ("B Holdings"), registered in Wyoming on or about May 11, 2020. B Holdings never performed any substantive business activities, but EAKES and his associate M.D. established a business bank account for B Holdings at JP Morgan Chase Bank, with an account number ending in -1122, on or about May 12, 2020. M.D. was listed as the sole signatory.
- Brokerage Holding LLC ("Brokerage Holding"), registered in Wyoming on or about January 13, 2020. Brokerage Holding never performed any substantive business activities, but EAKES and M.D. established a business bank account for Brokerage Holding at Bank of America, with an account number ending in -7008, on or about May 21, 2020. M.D. was listed as the sole signatory.

On or about February 11, 2020, EAKES also established a business bank account in the name of YAG at JP Morgan Chase Bank, with an account number ending in -0536. EAKES was listed as the sole signatory. On or about February 26, 2021, EAKES established an additional business bank account in the name of CMS at BBVA, with an account number ending in -6502. EAKES was listed as the sole signatory. Neither YAG nor CMS ever performed any substantive business

activities, but conducted financial transactions in the Middle District of Florida and elsewhere.

Lender-1 was a financial institution headquartered in Utah that was federally insured by the Federal Deposit Insurance Corporation ("FDIC") and a member bank of the Federal Home Loan Bank System. Lender-1 participated in the SBA's PPP as a lender and, as such, was authorized to lend funds to eligible borrowers under the terms of PPP.

Lender-2 was a financial institution headquartered in Pennsylvania that was federally insured by the FDIC and a member bank of the Federal Home Loan Bank System. Lender-2 participated in the SBA's PPP as a lender and, as such, was authorized to lend funds to eligible borrowers under the terms of PPP.

Lender-3 was a financial technology company headquartered in California, and a participating PPP lender that issued PPP loans guaranteed by the SBA. Processor-1 was a technology company that provided an Internet -based platform to receive and process PPP loan applications for, among other PPP lenders, Lender-3. Processor-1 processed application for PPP loans submitted to Lender-3 through an Internet-based web portal that was hosted on servers located in Virginia and Oregon.

Scheme to Defraud

From an unknown date but not later than in or around March 2020, and continuing through in or around November 2021, EAKES knowingly and intentionally devised and executed schemes to defraud PPP Lenders-1, -2, and -3 and

the SBA through the submission of fraudulent PPP loan applications containing materially false misrepresentations and supporting documents. EAKES obtained a total of $4,603,280 in proceeds as a result of the bank fraud scheme involving Lenders-1 and -2; and a total of $148,990 in proceeds as a result of the wire fraud scheme involving Lender-3.

On or about May 5, 2020, EAKES submitted to Lender-1 via the Internet a false loan application on behalf of YAG, which had no employees other than EAKES at the time and conducted no legitimate business activities, seeking a loan in the amount of $960,625. On the application, which EAKES submitted using his own name, EAKES falsely stated that YAG had 54 employees with an average monthly payroll of $384,250. EAKES falsely represented that all SBA PPP loan proceeds would be used only for business-related purposes of YAG, and certified that the PPP funds acquired from the requested loan would be used to "retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments" on behalf of YAG. EAKES submitted with the application a fraudulent Internal Revenue Service ("IRS") Form 944 for YAG. In reality, neither EAKES nor YAG ever filed a Form 944 with the IRS.

EAKES's materially false loan application for YAG caused Lender-1 and the SBA to approve the loan, and Lender-1 deposited $960,625 in PPP loan funds into the JP Morgan Chase Bank account in the name of YAG, with an account number ending in -0536.

On or about May 13, 2020, EAKES submitted to Lender-1 via the Internet a false loan application on behalf of B Holdings, which had no employees other than EAKES at the time and conducted no legitimate business activities, seeking a loan in the amount of $1,794,555. On the application, which EAKES submitted under the name of his associate M.D., EAKES falsely stated that B Holdings had 89 employees with an average monthly payroll of $717,822. EAKES falsely represented that all SBA PPP loan proceeds would be used only for business-related purposes of B Holdings, and certified that the PPP funds acquired from the requested loan would be used to "retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments" on behalf of B Holdings. EAKES submitted with the application fraudulent IRS Forms 941 for B Holdings, as well as a fraudulent JPMorgan Chase Bank account statement for the B Holdings account, with an account number ending in -1122. In reality, neither EAKES nor B Holdings ever filed a Form 941 with the IRS, and the bank statement had been doctored to substantiate the purported payroll activity.

EAKES's materially false loan application for B Holdings caused Lender-1 and the SBA to approve the loan, and Lender-1 deposited $1,794,555 in PPP loan funds into the JP Morgan Chase Bank account in the name of B Holdings, with an account number ending in -1122.

On or about June 18, 2020, EAKES submitted to Lender-2 via the Internet a false loan application on behalf of Brokerage Holding, which had no employees other than EAKES at the time and conducted no legitimate business



activities, seeking a loan in the amount of $1,848,100. On the application, which EAKES submitted under the name of D.S., EAKES falsely stated that Brokerage Holding had 102 employees with an average monthly payroll of $739,243. EAKES falsely represented that all SBA PPP loan proceeds would be used only for business-related purposes of Brokerage Holding, and certified that the PPP funds acquired from the requested loan would be used to "retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments" on behalf of Brokerage Holding. EAKES submitted with the application a fraudulent IRS Form 941 for Brokerage Holding. In reality, neither EAKES nor Brokerage Holding ever filed a Form 941 with the IRS.

EAKES's materially false loan application for Brokerage Holding caused Lender-2 and the SBA to approve the loan, and Lender-2 deposited $1,848,100.00 in PPP loan funds into the Bank of America account in the name of Brokerage Holding, with an account number ending in -7008.

On or about April 1, 2021, EAKES submitted to Lender-3 via the Internet a false loan application on behalf of CMS, which had no employees other than EAKES at the time and conducted no legitimate business activities, seeking a loan in the amount of $148,990. On the application, which EAKES submitted under the name of his associate H.R., EAKES falsely stated that CMS had 19 employees with an average monthly payroll of $59,596. EAKES falsely represented that all SBA PPP loan proceeds would be used only for business-related purposes of CMS, and certified that the PPP funds acquired from the requested loan would be used to

"retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments" on behalf of CMS. EAKES submitted with the application fraudulent IRS Forms 941 for CMS. In reality, neither EAKES nor CMS ever filed a Form 941 with the IRS.

Processor-1 processed the application on behalf of Lender-3, which EAKES had submitted from the Middle District of Florida. EAKES's materially false loan application for CMS caused Lender-3 and the SBA to approve the loan, and Lender-3 deposited $148,990 in PPP loan funds into the BBVA account in the name of CMS, with an account number ending in -6502.

With respect to all four of the fraudulent PPP loans obtained by EAKES, all of the loan funds were immediately transferred to the business bank account he controlled in the name of PaySystems at Regions Bank, with an account number ending in -8563. The loan funds were then either withdrawn in cash; used to purchase metals; or transferred to the PaySystems Tastyworks accounts where EAKES lost the funds through options trading, which did not constitute legitimate business-related activities under the PPP. Law enforcement obtained Regions Bank surveillance footage of approximately 14 transactions where EAKES either deposited a cashier's check constituting PPP loan proceeds into the PaySystems account, or withdrew loan proceeds in cash from that account.

Further, EAKES later submitted loan forgiveness requests for each of the loans, stating that the proceeds had been used for the legitimate purposes to

which he had falsely certified they would be used on the applications. Each of the loans were forgiven, and the SBA repaid each of the lenders.

Law enforcement interviewed M.D., the listed applicant for the B Holdings loan, as part of the investigation. M.D. stated that she never applied for the B Holdings PPP loan, nor did she authorize the application. She confirmed that the signatures on the application documents were not hers. M.D. advised that she met EAKES in Jacksonville and had briefly worked for him doing "data entry" for what she believed was an investment company. M.D. stated that she had also assisted EAKES by going to a bank branch to open an account for a "new business." EAKES went with M.D. to the bank, but asked M.D. to be the applicant for the account. EAKES subsequently controlled that account. M.D. stated she had provided EAKES with personal information such as her social security number (SSN) and date of birth (DOB) for what she believed was human resources purposes.

Law enforcement also interviewed D.S., who was the listed applicant for the Brokerage Holding loan. D.S. stated that he never applied for the Brokerage Holding PPP loan, nor did he authorize the application. He confirmed that the signatures on the application documents were not his. D.S. stated that, after the Small World account was closed, EAKES had asked him to open another business bank account in the name of another company. D.S. said EAKES went with him to the bank, where D.S. applied for the account. EAKES subsequently controlled that account. D.S. stated he had also previously provided EAKES with SSN and DOB for tax purposes

Law enforcement also interviewed H.R., the listed applicant for the CMS loan, and her brother R.R., the listed signatory on the PaySystems Tastyworks accounts. H.R. denied knowing EAKES, and stated that she never applied for a PPP loan in the name of CMS. R.R. advised, however, that he knew EAKES as having been his cousin's significant other who was in the investment business. R.R. stated that he had provided EAKES with both his own as well as H.R.'s personal information sometime in 2019 after their mother had passed away, because EAKES was going to help them with investments. R.R. denied ever hearing of PaySystems, Tastyworks, or CMS.